Nancy A. Berryhill We are, yes, we are on case number five. I'm not quite sure how she pronounces her first name. Gotoimoana Summers against Acting Commissioner Berryhill. If you are Mr. Forbes, we're ready for you. Yes, Your Honor. And you've pronounced it correctly. Excellent. May it please the court, my name is Randall Forbes. I represent the appellant. I represented the appellant at the district court but not at the administrative level. So my perspective is not as complete as it usually is when I'm here. Give me one second to set this up. Okay. One thing I would like the court to keep in mind is that Ms. Summers, the appellant, is borderline intellectual functioning. And that was found by the consultative examiner of the Social Security Administration and confirmed by her own testimony that she did have some special education. Now she is from an era, the very early 80s, where a lot of states did not preserve special education records or have good special education records. So other than her testimony and that consultative examiner's opinion, that's probably all the evidence there is. Well, she qualified her graduation from high school and said that she was in special ed. Yes. She graduated from high school and she testified she was in special education. And that in and of itself is a pattern that I think is evident in her life. She's able to stick with things despite the borderline intellectual functioning, which all of you know is between IQ 70 and 80. So before you get too much further down this line, as I understood your opening brief, though, that wasn't one of the things that you highlighted. You don't think that the RFC is correct. You have criticism about what did the ALJ mean when she said they have days and so on. So haven't you? I'm trying to give context because it's going to come up again and again if we go down the credibility path, which I anticipate. So let's take what you are arguing. What's wrong with the RFC here? Well, I think the main thing is that it should have all of the hazard limitations in it. A lot of people take aspirin as a blood thinner, anticoagulant, whatever you want to call it. And they live, on the whole, perfectly normal lives. It doesn't mean you're a hemophiliac just because you're taking aspirin as a blood thinner. And I don't see any medical evidence in this record to show that she is on such large doses of whichever the anticoagulant of the moment is, that she's at risk of serious bleeding if she gets a paper cut or if she, you know, in other ways. Well, the point is we're not talking about paper cuts. Well, but even the heavy equipment. You know, your argument is she could cut herself on some moving piece of machinery or the like. But your reason for that isn't lack of coordination or something else. It's because she's on blood thinners. Right. And we're not talking just aspirin as you know. And I don't see where the medical evidence is. We're talking about Lovenox, Warfarin, and Prodoxa. Are those all blood thinners? Yes, they are. And my point on the evidentiary question is this. There are some facts of medicine that should be noticeable, either judicially noticeable or administratively noticeable. And in the Social Security administrative context with the informality of the evidentiary rules, the attorney doesn't even need to bring it up. But the attorney does. I mean, my issue, I'm obviously not being very clear, but she's taking these things, I understand, probably vis-à-vis herself before she was taking them. She's going to bleed more if she hurts herself. Right. But how much more is critical? Is this going to be something that's going to prevent her from doing her past relevant work as a production assembler? I don't know. There's no evidence in the record to say she's on a dose that's really a serious medical risk for her. I guess what I would ask is that don't make me take doctor's depositions on these issues because we burden them too much already. It should be enough that she's on the blood thinner and that the DOT description describes dangers that could cause her to bleed out. And in the DOT description of past work, there is plenty in there that can do that. And, again, we're not talking just about aspirin. We're talking... No, I see the list. The thing that's strange to me, actually, is looking at this DOT description, which you've put on page 20, and actually looking at the things the vocational expert's talking about, I'm stunned that there are a lot of jobs in the national economy or the regional economy that look like this since I was under the impression that robots were now doing these kinds of repetitive venture line assembly operations. And even if this was accurate as of 1990 when the DOT was put together, it's 27 years later. But there was no challenge to the use of these jobs, was there? There was not. Again, that's something I do habitually, but then I argue the Allura case, which made that really clear it should be done. Actually, if you want to sui sponte, remand this on the fact that the DOT is technologically obsolete and needs to be redone, and the whole system is just inadequate. We can do that. I would like you to do that, Your Honor. But I guess the physician burden is important here. But why wouldn't a letter just do? We have her on whichever blood thinner, and because of her situation and her dose, she really can't be around anything with sharp edges. I'm not a big fan of letters because 50%, 60%, 70% of the time I get back junk because people don't take the time to fill out what I send them. The only way I can resolve cases like this one is to take a doctor's deposition, and I perceive that in the administrative context of Social Security hearings, that's too burdensome. I've done it, but I can't do it 500 times a year. When you talk about looking at this thing, you can say she's got asthma, irregular heart rate, headaches, depression, anxiety, sleep apnea, and obesity. I thought, is she 5'2 or 5'5? I know that she's in that range. I would have to look it up. 290? Yes, she is obese, yes. But for that, I think a lot of those other things wouldn't be that much of a problem. I think that's the common understanding. Some would say, well, that's a prejudice or something. No, it's just sort of obvious that she has a lot of trouble getting around just because of that. It is, but the question is whether it's a chicken-and-the-egg type argument. Is she obese because of her cardiovascular problems, and she cannot engage in the kind of diet or activity, mainly? This is not a lady, though. This client is very sick, and I don't think that the judge appreciated that. I mean, she has a 4-centimeter dilation in her aorta, among other things. My main point, and I think you get it, is that blood thinners are meant to thin blood, and I shouldn't have to prove that. No, Mr. Forbes, you don't have to prove that. But as Chief Judge Wood was pointing out, it is a matter of degree. Because you seem to be suggesting here that anybody who has this medication needs to be treated, I mean, limited to padded rooms, right? Not entirely. I'm exaggerating slightly, but these are matters that actually do call for some evidence that would differentiate degrees, and we don't have any here. You're right. And this will come up again, but essentially the judge should have delved into that, and the attorney who was sitting there provided substantially less optimal representation because he should have delved into that. Now, let's go to my next point. I'll let you make your next point, but you are out of time. So go ahead and make your next point. Obesity, my argument on obesity is precisely this degree argument. The judge can't just say, oh, the person's obese, so I'm going to knock her down from medium to light, if the same logic and arguments would apply to knocking her down from light to sedentary or less than sedentary. The judge has to go into an explanation of how the degree of obesity relates to the impairments and why that specific exertional level is more appropriate than the others. I know case law kind of attacks against that argument because case law seems to suggest we need doctors setting forth limitations. Okay. I think we have your point, so thank you very much. All right. Thank you. If there is any time left, I'd like to reserve it. I'll see. Ms. Schwartz. Good morning, Your Honors. May it please the Court, my name is Allison Schwartz, and I represent the Commissioner of Social Security. Before I get into the body of my argument, I'd like to quickly address some of the points raised by Mr. Forbes. With regard to the borderline intellectual functioning, I would correct Mr. Forbes, Ms. Summers was not diagnosed with borderline intellectual functioning.  The evidence that he cited with regard to Ms. Summers being in special ed. does not really go to her disability claim, given that she had an 18-year work history during this time that she allegedly was in special ed. Well, after. I mean, she was in special ed when she was in school, and then she worked for a lot of years. Right, but the fact that she was in special ed. does not really suggest that she was unable to work. With regard to the blood thinners, I would just like to point out that if you look at the record in detail, for the most part, Ms. Summers was really only on blood thinners for about a month. The other time period, she was on aspirin. She identified that she was on blood thinners in her disability records. Well, aspirin is a blood thinner, and I think the testimony showed that she'd run out of money, basically, so she couldn't get the fancy prescription things. Aspirin, obviously, is pretty cheap to buy in any drugstore, but it's definitely used as a blood thinner. She was on a stronger blood thinner for about a month. But the important point from that, really, is that she had fairly extensive cardiac care, and none of her doctors noted that she was ever at risk for any sort of bleeding side effect. And Mr. Forbes mentioned something about a doctor's opinion a couple times. I would like to note that the ALJ referenced in her decision that Ms. Summers' longtime primary care physician, Dr. Thomas, apparently completed a disability opinion, and the records show in his treatment notes that he faxed it into Ms. Summers' attorneys, and that was never provided to the agency. I don't know what that opinion said, but it's just something to consider, that the fact that there's no opinion on record that shows that she had any limitations greater than the ones found by the ALJ, and that there's this opinion that was apparently completed but never given to the agency. The other point that I would like to make with regard to the obesity is, again, Ms. Summers was obese through most of her career, dating back several years, and it did not limit her ability to work. The ALJ acknowledged that once she started to develop the heart problems after her onset date, her obesity, coupled with her heart problems and her respiratory problems, caused some greater limitations. But the fact that her examinations were generally normal, she reported that she was able to walk every day on a treadmill, and the thorough consultative physical exam was normal, suggested that she was able to do the demands of light work. So one thing I'd like to note is that there's really two issues in this case. The first one is that the medical records did not support Ms. Summers' claims of disabling impairments. And the second one is that Ms. Summers herself was not a reliable witness, and the ALJ did not fully believe her testimony about her disabling impairments because they were inconsistent across the board. Well, the ALJ looks at a number of inconsistencies, right? So why was she no longer working at the Elkhart plant? So there are a couple of stories before it turns out she was fired, although it does sound like she was fired because her behavior was bizarre, which does take me back to wondering about her mental condition. She's also inconsistent about some other things. I'm trying to remember what they are. Oh, her substance use, whether she's using alcohol or marijuana or other substances. That's correct. And you are correct, Your Honor, that the record does bear out that Ms. Summers may have had interpersonal problems at work, and that is one of the reasons why the ALJ imposed a limitation that precluded her from anything more than occasional interaction with others. So those facts were not lost on the ALJ. She realized that and accommodated those. And in addition to the inconsistencies you point out, Ms. Summers apparently told her doctor that she was going for mental health counseling once a week, but the record does not suggest that she ever went for mental health counseling. Didn't she go to that one facility at least on one occasion? That's where she admitted to the drug use? She did. She had one intake evaluation, and after that intake evaluation, the therapist suggested that she continue with counseling, and Ms. Summers did not, although she told her doctor a couple months later that she was going once a week. I thought she said there was a financial problem with doing that. You know, everybody charges, right? She testified that there was a financial problem for doing that, but that doesn't seem to be corroborated by the record, and the ALJ pointed that out. And, in fact, Ms. Summers testified that she did have health care. She was on her husband's insurance. But then they're separate, right? But they were not divorced, so even as of the time of the hearing, she was still on her husband's insurance. Given the numerous inconsistencies the court had pointed out, the ALJ did not have a duty, as Ms. Summers suggested, to ask more questions about Ms. Summers' alleged bad days at the hearing. That's one of the main arguments in Ms. Summers' brief. The ALJ thoroughly questioned Ms. Summers about her impairments at the hearing. Ms. Summers had an attorney who did not follow up with regard to these alleged bad days. And Ms. Summers mischaracterizes bad days testimony in her brief. She said it related to her allergic rhinitis, chronic ear infections, and sinusitis. But at the hearing, Ms. Summers was really testifying that she had bad days because she got depressed. And, again, that was not lost on the ALJ. The ALJ considered Ms. Summers' depression and accommodated it in her mental RFC. The obesity argument, I believe we may have covered that already. The ALJ thoroughly considered Ms. Summers' obesity, and she discounted a medical opinion for medium work because that opinion didn't fully account for her obesity. The other argument Summers raised is that the ALJ should have considered awarding a period of disability benefits for about a year and a half during the time period from when Ms. Summers was diagnosed with atrial fibrillation until May 13th, where she had a hospital visit, where she had a cardiac catheterization, a test that ruled out the fact that she didn't have coronary artery disease. Ms. Summers has not given any evidence suggesting that she was precluded from working during that time period. The ALJ acknowledged that her heart problems were severe impairments, did not preclude her from working. The cardiac workup that she had during the period in question was unremarkable. Her heart problems were well treated with her medication, and the only times that she appeared to have episodes were when she wasn't complying with her medication. But since that time, her medication was under control, and as of the hearing, she was having no symptoms. The final argument that Ms. Summers raised is that the ALJ should have considered her work history. While Ms. Summers did have a long work history, the ALJ was not required to believe her statements of disability wholesale, given the numerous inconsistencies in her testimony. In addition to that, agency policy does not require ALJs to consider a claimant's work history. Although the Seventh Circuit has suggested that ALJs should, they will not reverse, whereas here, an ALJ provides a very thorough symptom evaluation. And here, the ALJ built a coherent and detailed logical bridge from the evidence to her conclusion that Ms. Summers could perform light work. And if the Court has no further questions, I will just sit down and respectfully request that the Court affirm the ALJ's decision. All right, thank you very much. Thank you. I think that should do it. We actually went over with you anyway, Mr. Forbes, so we will take this case under advisement.